# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 8, 2019

Lyle W. Cayce
Clerk

No. 18-40057

M. D., by next friend Sarah R. Stukenberg; Z. H., by next friend Carla B. Morrison; S. A., by next friend Javier Solis; A. M., by next friend Jennifer Talley; J. S., by next friend Anna J. Ricker; H. V., by next friend Anna J. Ricker; L. H., by next friend Estela C. Vasquez; C. H., by next friend Estela C. Vasquez; A. R., by next friend Tom McKenzie, individually and on behalf of all other similarly situated,

>      Plaintiffs - Appellees

v.

GREG ABBOTT, in his official capacity as Governor of the State of Texas; COURTNEY PHILLIPS, in her official capacity as Executive Commissioner of the Health and Human Services Commission of Texas; HENRY WHITMAN, JR., in his official capacity as Commissioner of the Department of Family and Protective Services of the State of Texas,

>      Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This case returns to us after a limited remand. After our opinion in *M.D. by Stukenberg v. Abbott* (*Stukenberg I*), 907 F.3d 237 (5th Cir. 2018), the district court was tasked with modifying its injunction remedying certain constitutional deficiencies in Texas's foster-care system. The State now asks

No. 18-40057

us to vacate many of the modified injunction's provisions. For the following reasons, the modified injunction is affirmed in part, affirmed with modification in part, and vacated in part.

I.

This case's underlying facts are thoroughly laid out in *Stukenberg I*, 907 F.3d at 243–47. In short, this case is about the constitutionality of Texas's foster-care system. Plaintiffs are a certified class of minor children in the permanent management conservatorship (PMC) of the Department of Family Protective Services (DFPS). We previously found that DFPS's policies violated Plaintiffs' substantive-due-process rights in two ways: (1) by maintaining overburdened caseworkers who are responsible for the children in the PMC; and (2) by failing to adequately monitor and oversee the children in the licensed foster care (LFC) subclass. *Id.* at 256–68. But we reversed the district court's other two liability findings. *Id.* at 268–70. We did not believe that DFPS's placement array or the foster group homes—in and of themselves— created a constitutionally cognizable harm to the children. *Id.*

Based on these findings, we evaluated the district court's extensive injunction, which mandated dozens of specific remedial measures. *Id.* at 271– 87. We noted that an injunction must be narrowly tailored to cure the specific constitutional violations at issue and must not go beyond what is "minimally required" to bring the State into constitutional compliance. *Id.* at 272. With this standard in mind, we validated and invalidated many of the injunction's specific provisions. *Id.* at 271–87. We concluded by remanding the case to modify the permanent injunction "consistent with this opinion." *Id.* at 288. The remand was a limited one. *Id.*

After *Stukenberg I* issued, the district court promptly requested briefing on how to comply with *Stukenberg I*. And in November 2018, the district court

No. 18-40057

issued the modified injunction. The State now appeals, unhappy with the district court's revisions.

## II.

Whether a modified injunction comports with a remand order is reviewed de novo. *See Ball v. LeBlanc*, 881 F.3d 346, 350–51 (5th Cir. 2018). The district court must "implement both the letter and the spirit of the appellate court's mandate and . . . not disregard the explicit directives of that court." *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004). It cannot reopen issues expressly or implicitly decided by the appellate court. *Gene & Gene, LLC v. BioPay, LLC*, 624 F.3d 698, 702 (5th Cir. 2010).

At the same time, the grant of a permanent injunction is reviewed for an abuse of discretion. *Stukenberg I*, 907 F.3d at 248.

## III.

The State argues that many of the modified injunction's provisions are improper, either because they are inconsistent with *Stukenberg I*, are outside the scope of the limited remand, or are substantively problematic. The specific provisions at issue are: (1) the 24-hour-supervision provisions; (2) the face-to-face-meeting provision; (3) the workload-study provisions; (4) the integrated-computer-system provisions; (5) the missing-medical-records provision; (6) the Monitor provisions; and (7) the termination provisions. We take them in that order.

### A.

In its 2015 liability opinion, the district court prohibited the State from placing children in "foster group homes that lack 24-hour awake-night supervision." We did not disturb that ruling in *Stukenberg I*. On remand, the district court expanded the supervision requirement to apply to all PMC placements housing more than six children. The State urges that this expansion improperly exceeds the scope of the limited remand.

No. 18-40057

In making this argument, the State misconstrues *ODonnell v. Goodhart (ODonnell II),* where this court considered whether a modified injunction dealing with Texas's bail system complied with the mandate rule. 900 F.3d 220 (5th Cir. 2018). In a previous case, we had vacated the original preliminary injunction over the bail system and remanded so that the district court could "craft a revised injunction—one that is narrowly tailored to cure the constitutional deficiencies the district court properly identified." *ODonnell v. Harris Cty. (ODonnell I),* 892 F.3d 147, 166–67 (5th Cir. 2018). In *ODonnell II,* this court found that a particular provision fell "outside the confines of [the] narrow remand" because it addressed a problem not "originally identified" by the district court. 900 F.3d at 225. This court continued: "Remand is not the time to bring new issues that could have been raised initially." *Id.*

Such is not the case here. In *Stukenberg I,* we recognized that the 24-hour-supervision requirement had remedied the "most egregious" problem with the foster group homes: a "lack of adequate supervision." 907 F.3d 237, 270. The district court's original injunction addressed that violation, albeit in an overbroad manner. Indeed, we invalidated the original provision prohibiting "any family-like placement that houses more than six children" because we failed to see why—absent the supervision problems—the conditions in the foster group homes unconstitutionally amplified the risk of harm to the children. *Id.* at 270, 282. In contrast, rather than outright banning placements housing more than six children, the modified injunction simply requires 24-hour-supervision. In doing so, it hews more closely to the violation identified in *Stukenberg I*: the lack of proper supervision. Thus, this case is unlike *ODonnell II*, as the district court has not attempted to rectify a newly identified problem.

In addition to its primary argument, the State also notes that the modified injunction's 24-hour-supervision requirement would apply not only to

No. 18-40057

LFC placements but also to unlicensed placements, such as kinship placements in which a child is placed with a relative. This would be problematic. Plaintiffs do not object to modifying the requirement to clarify that it applies only to LFC placements. So we do exactly that. The 24-hour-supervision requirement is affirmed with the modification that it applies only to LFC placements, not unlicensed placements.

## B.

In *Stukenberg I*, we invalidated many "caseload-specific injunction provisions." 907 F.3d at 274. We did so because they "exceed[ed] what [was] required to achieve constitutional compliance or [did] not directly address the problems giving rise to the caseload management violation." *Id.* Among the provisions struck down for these reasons was one prohibiting DFPS from using I-See-You (ISY) workers.[1] *Id.*

Despite our elimination of this provision, the district court reinserted a similar one in the modified injunction. The injunction now requires that all monthly face-to-face meetings with the PMC children be conducted by primary caseworkers, not ISY workers. The State argues that the new provision is a reincarnation of the invalidated one banning the use of ISY workers. While nominally allowing ISY workers to exist, the new face-to-face provision eliminates their primary responsibility. Thus, the State argues that it is inconsistent with *Stukenberg I*.

In response, Plaintiffs exclaim that the face-to-face provision is one of the modified injunction's most important. On their account, it "directly addresses the fundamental problems with the State's existing practices with regard to secondary caseworkers." They then spill much ink pointing out the

---

[1] ISY workers are secondary caseworkers who help the primary caseworkers. 907 F.3d at 245. They do so mainly by conducting in-home visits and confirming that the child "is still there." *Id.*

5

deficiencies of ISY workers when it comes to conducting face-to-face visits with the PMC children and the virtues of requiring primary caseworkers (who have more training and experience) to conduct all face-to-face visits.

While Plaintiffs are correct that the State's use of ISY workers has many problems, their argument fails to acknowledge that we did not find those problems constitutionally suspect in *Stukenberg I*. We discussed the insufficiency of ISY workers solely to show that DFPS's use of them did not show a reasonable effort to alleviate the substantial risks associated with overburdened primary caseworkers. 907 F.3d at 262–63. It was the crushing workload on primary caseworkers—not ISY workers' face-to-face visits—that we held violated Plaintiffs' substantive-due-process rights. *Id.* at 264–65. And it is in relation to that violation that the district court was supposed to revise the injunction.

With this violation in mind, the modified injunction's face-to-face provision cannot stand. Imposing on primary caseworkers the additional duty of conducting all face-to-face visits no more "directly address[es] the problems giving rise to the caseload management violation" than does the invalidated provision eliminating ISY workers. *Id.* at 274. In fact, it would likely increase their workload. It appears that this provision was the district court's well-intentioned attempt to fix the problems with ISY workers' face-to-face visits. But eliminating those problems was not what the district court was charged with doing on remand.

The face-to-face provision is vacated as being inconsistent with *Stukenberg I*.

## C.

The first time around, we struck down the caseload caps on primary caseworkers and the Residential Child Care Licensing (RCCL) investigators, but we also made clear that DFPS should "determine how many cases, on

average, caseworkers" and RCCL investigators can safely manage and should then establish internal guidelines for caseload ranges. *Stukenberg I*, 907 F.3d at 274, 279. On remand, the district court implemented this recommendation by ordering DFPS to conduct workload studies as to both types of workers. Yet it did not leave the studies' planning and execution solely in the hands of DFPS. Instead, it stated that "DFPS, in consultation with and under supervision of the Monitors, shall propose [workload studies]" at which point the court would "convene a hearing to review the proposal[s]."

The State contends that by requiring the workload studies to be done under the Monitors' and the court's supervision, the district court deviated from *Stukenberg I*'s instructions. The *Stukenberg I* opinion makes clear, the State says, that DFPS should be able to determine—all on its own—how many cases, on average, caseworkers and RCCL investigators can safely carry.

We reject the State's argument. The district court undoubtedly has the equitable power to oversee compliance with its own injunction. The supervision requirement over the workload studies simply makes explicit that implicit power. We do not read *Stukenberg I* as forbidding the court from exercising control and supervision over the workload studies—especially when the State has a history of conducting them inadequately. *See* 907 F.3d at 261. Moreover, despite the supervision and input from the Monitors and the district court, DFPS will still be involved in designing and conducting the workload studies, and reaching conclusions from them. All this is to say, the district court's supervision requirement is faithful to the spirit of *Stukenberg I* and does not do clear violence to its letter.[2] *See Lee*, 358 F.3d at 321 (noting that the district

---

[2] The State also complains that it is impossible to design and conduct the studies within the 60-day timeframe the district court imposed. Should that be the case, the State can always move for an extension, which the court should generously consider.

No. 18-40057

court must "implement both the letter and the spirit of the appellate court's mandate").

## D.

Next, we turn to the integrated-computer-system requirement. We previously upheld the original injunction's provision demanding the creation of an "integrated computer system" containing the PMC children's "complete records, including but not limited to a complete migration of all medical, dental, educational, placement recommendations, court records, mental health and caseworker records." *Stukenberg I*, 907 F.3d at 282–83. The district court reincorporated this provision into the modified injunction and also included a provision giving all relevant personnel access to the complete records in the integrated computer system.[3]

The State does not deny that the district court faithfully adhered to *Stukenberg I* by reincorporating these provisions. Nor could it. Rather, it seeks to reargue on the merits that the integrated-computer-system requirement should be invalidated because it is unprecedented, tremendously expensive, and maybe even impossible to accomplish.

We treat the State's request as a quasi-motion for reconsideration on this issue.[4] And after careful review, we see that our initial decision upholding the integrated computer system was erroneous. It is inconsistent with the broader

---

[3] In *Stukenberg I*, we did not expressly validate the requirement that all personnel have access to the complete records. We inadvertently listed the provision creating the computer system twice, instead of listing the accompanying access provision. 907 F.3d 282–83. No one disputes that *Stukenberg I* intended to validate the access provision as well.

[4] We can do so because the mandate has not issued in *Stukenberg I*; the remand was limited, and we retained jurisdiction. But by saying the mandate never issued, we do not mean to suggest that the district court was free to disregard *Stukenberg I*. It was not. Consequently, it is appropriate—as we have done throughout this opinion—to use the mandate rule (technically not quite on point) to evaluate the district court's compliance with *Stukenberg I*. We hold only that we, as the appellate panel that issued *Stukenberg I*, can reconsider our own prior holdings after a limited remand when the mandate never issued.

No. 18-40057

remedial principles we laid out in *Stukenberg I*. The multimillion-dollar computer-system overhaul—while maybe a best practice—goes well beyond what is minimally required to remedy the caseload and oversight violations. Indeed, we find it (just like the caseload cap) to be "too blunt a remedy for a complex problem." 907 F.3d at 274. An integrated computer system, which at most two other States use, cannot represent the constitutional floor for record-keeping.

Accordingly, we now invalidate the integrated-computer-system requirement and the accompanying access provision. The goal is a constitutionally effective foster-care program, not a specific kind of computer system used to help achieve that goal.

E.

Invoking our expressed validation of the integrated computer system, the district court ordered DFPS on remand "to address and remediate missing and nonexistent medical and mental health care records." According to the district court, a comprehensive computer system "would not be effective for preventing an unreasonable risk of serious harm if medical records were missing or nonexistent." Because we have invalidated the integrated computer system, there is no longer a justification for this provision. Therefore, it is vacated as well.

F.

Next up are the Monitor provisions. The original injunction contained 13 provisions appointing and listing the Monitors' duties. We did not address those provisions in *Stukenberg I*. The modified injunction includes those 13 original provisions plus 3 new ones. The new provisions (1) give the Monitors remote access to the electronic systems DFPS uses to store data about the PMC children, (2) compel DFPS to "supply the Monitors [with] raw data relevant to the 2015–2016 workstudy conducted by DFPS" and all the available data

No. 18-40057

"relevant to all previous third-party studies," and (3) command the State to pay the Monitors. The State lodges both procedural and substantive attacks against these provisions.

On the procedural side, the State argues that the limited remand is not the time to impose new requirements that could have been included in the original permanent injunction. For support, the State again draws on *ODonnell II*. But once more it is distinguishable. The problematic injunctive provision in *ODonnell II* was substantive. It attempted to remedy a constitutional deficiency the original injunction did not identify. 900 F.3d 220 at 225. The Monitor provisions, on the other hand, are administrative. They do not attempt to solve a new constitutional puzzle originally left unaddressed by the district court; they simply represent the district court's revised attempt to ensure that the State fixes the constitutional problems it identified (and we affirmed) in the original injunction.

As the State's procedural argument is unavailing, we now turn to its substantive objections, which concern the remote access and third-party data.[5]

First, the State argues that the new provision providing the "Monitors, their staff[,] and consultants with unrestricted, routine and ongoing remote access" to DFPS's electronic systems is a serious confidentiality risk and could result in the inadvertent alteration or destruction of vital records. The State is primarily concerned with giving such unrestricted access to the staff and consultants without requiring them to keep the information confidential. As the State correctly points out, they may not be qualified to handle such sensitive information. The district court's failure to address these legitimate confidentiality concerns was an abuse of discretion. So while we affirm the

---

[5] The State has no substantive complaints about the provision compelling it to compensate the Monitors.

10

remote-access provision, we modify the injunction to require that any of the Monitors' staff and consultants who have unrestricted, remote access to DFPS's systems be qualified to handle the information (including screening for criminal history), be taught how to use the systems, and be given confidentiality agreements to sign.

Second, the State argues that requiring DFPS to turn over "all available raw data relevant to all previous third-party studies" is overly burdensome, wasteful, and has no conceivable benefit. Plaintiffs do not contest this point in their brief. And we agree that requiring the State to turn over this data was an abuse of discretion. The district court made no findings justifying such an expensive and time-consuming production. Nor did it state what the purpose of doing so would be. We vacate the injunctive provision dealing with the previous third-party studies. This vacatur does not apply to the data relevant to the 2015–2016 workstudy to which the State has no objection.

G.

Finally, the State objects to the modified injunction's termination provisions. These same provisions were in the original injunction, yet we heard nothing from the State about them in the original appeal. The State cannot now challenge these provisions. It is too late for that. The State's arguments are waived. *See Med. Ctr. Pharmacy v Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("The waiver doctrine bars consideration of an issue that a party could have raised in an earlier appeal in the case." (quotation omitted)).

IV.

As an administrative matter, Plaintiffs would like the stay lifted in full. We decline to do so, and the stay will remain in place until the final mandate issues.

No. 18-40057

\* \* \*

For the foregoing reasons, we AFFIRM in part, AFFIRM with MODIFICATION in part, and VACATE in part. The case is remanded to the district court to begin implementing, without further changes, the modified injunction with the alterations we have made.

No. 18-40057

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting as to parts III.D and III.E, and otherwise concurring.

I cannot join the majority's continued erasing of relief carefully constructed by the district court to remedy DFPS's recognized constitutional violations.[1] With this agency the devil is in the details, and the district court structured a remedy with particularized provisions, responsive to its detailed factual findings and focused study by its appointed Special Masters. This panel unanimously upheld several important and strong directives, but the majority simultaneously removed others that were essential to remediating the State's deliberate indifference. In doing so, the majority did not engage the district court's detailed factual findings underlying its remedial relief. It rather dispatched groups of provisions as superfluous and not narrowly tailored to the constitutional wrong with no deference to those findings.[2]

Today, I turn to the most recent of the majority's excisions, affecting an area of overarching importance: a records system, not a backwards-looking retention of data, but rather a forward-looking process that would empower enfeebled caseworkers and bring needed administrative transparency, serving a role not unlike medical records in a hospital—a necessity. Indeed, with its first myriad excisions of remedies targeting specific problems—not least vacatur of the caseload cap requirement, addressing the core problem of overloaded caseworkers—the majority left the record system in place, leaving it to play an even greater role, one central to the remedy for the found constitutional wrong. And now the majority strikes even the provisions for creating an integrated record keeping process.

---

[1] The attached Appendix sets out the previously excised remedial provisions, along with the majority's rationale for each removal. *See* Appendix, *infra*.

[2] *See M.D. by Stukenberg v. Abbott (Stukenberg I)*, 907 F.3d 237, 297–303 (5th Cir. 2018) (Higginbotham, J., concurring in part and dissenting in part).

No. 18-40057

With respect, in vacating provisions ordering DFPS to create an integrated computer system to rationalize record keeping for PMC children, the majority completes its walk away from the district court's interlaced remedial scheme, taking away provisions essential to its success. Simply put, these removed injunctive provisions would strike at DFPS's administrative chaos and inefficiency, problems at the heart of the agency's failure to protect the thousands of PMC children entrusted to its custody. Recognizing this, we unanimously affirmed their inclusion in *Stukenberg I*. Nothing has changed in law, fact, or argument, yet the majority vacates these provisions today, a decision flawed by the evidence and controlling legal principles.

I.

The State did not previously challenge our decision in *Stukenberg I*. To the contrary, we remanded "for modification [of the injunction] consistent with th[e] opinion."[3] On remand, determined to protect its earlier successful efforts to strip many injunctive provisions in *Stukenberg I*, the State reminded the district court that the scope of the remand was "narrow," and that,

> The Court should address only the language and provisions in the Final Order that the Fifth Circuit identified as requiring modification . . . adher[ing] strictly to the Fifth Circuit's directives and reasoning when modifying the remedial provisions. . . . Issues or arguments that are not expressly addressed in the Fifth Circuit's non-dispositive opinion are beyond the scope of a limited remand.

Our remand order contemplated that these same limitations of scope would apply to any further appeal from the remand, for the review would be only of the district court's modifications of the injunctive relief, that is, for

---

[3] *Id. at* 288 (majority opinion).

No. 18-40057

compliance with our remand order. So, when the State filed its notice of appeal, we stayed implementation of the district court's order, stating,

> The district court's original injunctive order included provisions that were not challenged, provisions that were challenged and upheld, and provisions that were challenged and invalidated by this court. Although the appellants' brief has not yet been filed, we assume that the issue on this new appeal is whether the ordered modifications were implemented.

The State then filed its brief urging error in the district court's implementation of our modifications. Consistent with its efforts to preserve its earlier success, it had not objected to the integrated computer system provisions in the district court on remand. Now, it timorously asks this court to "reevaluat[e]" the integrated computer system provisions, tacking on a new argument in six pages of a 55-page brief. At oral argument, the State's counsel concentrated on modification issues, only asking that we revisit the record-keeping request with a nigh off-the-cuff contention that *Stukenberg I* had demanded "best practices," that, to counsel's knowledge, no other state uses such an integrated digital system. Plaintiffs' counsel responded that at least three other states have used integrated systems for years—with no argument to the contrary from the State's counsel in reply.[4] For example, in Tennessee,

---

[4] Texas does not stand alone in currently facing litigation over its foster care system based in part on deficient record-keeping. *See* Complaint at 59–61, *McIntyre ex rel. M.B. v. Colyer*, No. 18-cv-2617 (D. Kan. Nov. 16, 2018), ECF No. 1 (describing data failures in Kansas's foster care system, including failure to adequately document children's mental health needs and information about monthly visits); First Amended Complaint at 29–34, *M.B. by Eggemeyer v. Tidball*, No. 2:17-cv-4102-NKL (W.D. Mo. July 3, 2017), ECF No. 22 (describing the Missouri foster care system's failure to maintain centralized medical records for children in its care). Indeed, since the 1990s, courts have played a role in requiring states to update their digital record-keeping in response to litigation over constitutional inadequacies in their foster care systems. *See* Modified Final Order at 64–73, *LaShawn A. by Moore v. Dixon*, No. 1:89-cv-01754-TFH (D.D.C. Nov. 18, 1993) (requiring a "unitary computerized information system that will record and report information sufficient to permit Department social workers and administrators to achieve compliance with relevant

one of the states the plaintiffs named, a modernized digital records system has contributed significantly to the turnaround in that state's child welfare system.[5] The majority, in a complete about-face, vacates the integrated computer system provisions. This without a change in law or fact since the filing of our opinion in *Stukenberg I*, and where the reexamination of these provisions is plainly beyond the crafted scope of our remand order.

Limited remands play a useful, but restricted, role. We grant a limited remand where we task a district court to answer a discrete question necessary for resolution of an issue before us. We retain jurisdiction to enable a return for resolution of those issues yet pending before us.[6] That is not this case. *Stukenberg I* finally decided the issues before us on that appeal. It "remand[ed] the permanent injunction for modification consistent with th[e] opinion," providing that "should either party seek appellate review following modification of the injunction by the district court, the appeal will be assigned to this panel."[7] There was no supplemental finding the district court needed to make or explanation to give for *Stukenberg I* to become final. If neither party had appealed, the implementation of *Stukenberg I*—the only issue before the

---

provisions of District of Columbia law and with all the provisions of this Order"); Consent Decree at 109–12, *Juan F. by Lynch v. O'Neill*, No. 2:89 CV 859 (SRU) (D. Conn. Jan 7, 1991), ECF No. 90 (establishing a committee to develop a "single statewide networked computer system" that would include case file information for each child).

[5] *See* Kim Coleman & Jim Coleman, *Years of System-Wide Reform Results in Massive Turnaround for Tennessee's Child Welfare System*, HIGH GROUND NEWS (Aug. 9, 2017), *available at* http://www.highgroundnews.com/features/HistoricRulingDCS.aspx.

[6] *See, e.g.*, *United States v. Gomez*, 905 F.3d 347, 354–56 (5th Cir. 2018) (granting a limited remand for the district court to state whether it wished to modify its sentence given Supreme Court authority it had not appeared to consider); *Sultana Entm't, L.L.C. v. Gutierrez*, 740 F. App'x 81, 82 (5th Cir. 2018) (per curiam) (for the district court to explain its balancing of factors in dismissing a case for *forum non conveniens*); *United States v. Cessa*, 861 F.3d 121, 133 (5th Cir. 2017) (for the district court to make further findings on the suppression and materiality elements of a *Brady* claim); *United States v. Rocha*, 164 F. App'x 481, 481 (5th Cir. 2006) (per curiam) (for the district court to make findings regarding how to classify a defendant's offense of conviction for sentencing purposes).

[7] *See Stukenberg I,* 907 F.3d at 288.

No. 18-40057

district court—would not have returned to this court. We did not intend to retain jurisdiction over this case beyond the directive that any appeal promptly lodged should be assigned to this panel.

The majority asserts that the mandate did not issue in *Stukenberg I*, and it is free to treat the State's arguments against the integrated computer system provisions as a "quasi-motion for reconsideration." Whatever that may mean, even if the mandate did not issue—a matter of considerable uncertainty—the State elected to put its substantial success in attacking the district court's order in its pocket, not to be revisited. It filed no petition for rehearing with this court and carefully insisted upon the narrow issues the remand order put before the district court. We have a settled process for reconsideration of panel decisions before the mandate issues in the form of a petition for panel rehearing. That process requires a litigant to "state with particularity each point of law or fact that the petitioner believes the court has overlooked or misapprehended."[8] Concerns about timeliness aside,[9] the State does not argue that *Stukenberg I* "overlooked" or "misapprehended" a point of fact or law concerning the integrated computer system provisions. Nor can it. The State's initial argument against those provisions in *Stukenberg I* was only a brief statement that the provisions were among several injunctive provisions unsupported by expert testimony and an even more conclusory statement that the plaintiffs have no constitutional right to an integrated computer system. It is telling that the majority makes no effort to justify its decision to reconsider beyond concluding that "after careful review," it is convinced the relevant

---

[8] FED. R. APP. PROC. 40(a)(2); *see Boeta v. Fed. Aviation Admin.*, 736 F. App'x 453, 457 (5th Cir. 2018) (per curiam) (explaining that the proper mechanism for challenging a remand directive is to petition for panel rehearing, not to appeal from an order on remand).

[9] *See, e.g.*, *Uranga v. Davis*, 893 F.3d 282, 286 n.20 (5th Cir. 2018) (declining to consider a claim in a habeas litigant's opening brief because it was essentially an untimely attempt to seek reconsideration of the ruling on his motion for a certificate of appealability).

No. 18-40057

portion of *Stukenberg I* was "erroneous." The majority abuses *Stukenberg I*'s mistaken label of a "limited remand."

II.

The decision to vacate the integrated computer system provisions is misguided. Each element of the injunction must be viewed not in isolation but as a part of a broad "remedy with interacting parts, which as a totality redresses the constitutional wrong, itself not a single act but a collection of practices that together inflict injuries on PMC children."[10]

The integrated computer system provisions originate in the district court's years of study of DFPS, aided by the Special Masters. In its December 2015 liability opinion, the district court attributed PMC children's epidemic of physical and sexual abuse to, among other factors, DFPS's organizational and administrative chaos.[11] The court found the agency's records "incredibly disorganized,"[12] retained in numerous uncoordinated digital databases, as well as in paper files located with children's residences, placement agencies, caseworker offices, and medical service providers. Records addressing abuse and neglect investigations are maintained separately from case files, in a database to which caseworkers do not always have access.[13] The court found that DFPS's "outdated" digital system "impede[s] caseworkers' ability to review important electronic case file information" because it is "not in sync with current versions of forms that are used [by caseworkers]"—the inconsistencies "force[] arbitrary workarounds and repetitive entry of data."[14]

---

[10] *Stukenberg I*, 907 F.3d at 302 (Higginbotham, J., concurring in part and dissenting in part).

[11] *M.D. v. Abbott*, 152 F. Supp. 3d 684, 780 (S.D. Tex. 2015).

[12] *Id.* at 781.

[13] *Id.*

[14] *Id.* (internal quotation marks omitted).

No. 18-40057

The district court's December 2015 liability opinion observed that DFPS's record keeping leaves caseworkers ignorant of children's status, with harmful results for the children. "[C]aseworkers continuously fail to maintain complete, timely, and accurate documentation,"[15] generating "opportunities for important safety-related tasks to fall through the cracks, especially when cases are transferred between workers."[16] Caseworkers—children's "lifeline [and] connection to everything"[17]—spend nearly three quarters of their time in administrative work, and only the remainder working with families and children.[18] Even where a caseworker has time to care for a child, the inaccessibility of information limits the help a caseworker can provide, for example, where records leave caseworkers unaware that a child is a survivor of sexual abuse. The situation of the plaintiff S.A., whose story opened my opinion in *Stukenberg I*, is illustrative. It presents a narrative the district court found representative of the ongoing failures in DFPS's care for 12,000 PMC children, an exercise we found to be the product of more than a decade of deliberate indifference—a denial of fundamental constitutionally secured rights. As related before, within four months of entering Texas's foster care system, S.A. made her first sexual abuse outcry.[19] In response, the State requested an investigation by her private placement agency. But following the investigation, the private placement agency retained the report and no copy was deposited in DFPS's casefile.[20] As a result "no subsequent caseworker would have this information,"[21] meaning that S.A.'s caseworkers made

---

[15] *Id.*

[16] *Id.* (internal quotation marks omitted).

[17] *Id.* at 776 (internal quotation marks omitted).

[18] *Id.* at 780.

[19] *Id.* at 731.

[20] *Id.* at 732.

[21] *Id.*

19

decisions regarding her housing, medical care, education, and general physical well-being while potentially uninformed of the life-changing trauma she experienced under DFPS care. It was in this context that the opinion concluded that "DFPS['s] paperwork and electronic filing system . . . must become more efficient [and each] child should have a readily accessible and organized case file, comprised of all records pertaining to that child."[22]

Pursuant to the district court's liability opinion, the court-appointed Special Masters Kevin Ryan and Francis McGovern studied DFPS record-keeping practices. In July 2016, the Special Masters reported DFPS's representations that the agency's modernization of its IMPACT system was close to unifying PMC children's records, and that the agency was requesting appropriations to complete this work. While the Special Masters recognized this modernization effort may not completely address the district court's concerns regarding record-keeping, they were "encouraged that the State . . . [wa]s on the right path here." DFPS indicated that it was on track to report the establishment of a centralized system by the Fall of 2016.

That hope was dashed, and in November 2016 the Special Masters submitted recommendations to the district court, including that

> DFPS submit a plan with specific timeframes, subject to Court approval, to ensure that DFPS staff and contractors working with PMC children have access to all the case information they need to serve children in one centralized place. . . . The DFPS plan should ensure that DFPS caseworkers and supervisors serving PMC children, as well as CASA staff and volunteers . . . have access to an integrated, current, complete, and accurate case record for PMC children on their caseloads . . .

---

[22] *Id.* at 825.

In response, the State objected to every one of the Special Masters' recommendations, including the integrated computer system provisions, arguing they were "not . . . tailored to remediate a constitutional violation because there is no reliable evidence that DFPS's existing systems for maintaining and accessing PMC children's case records pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions and no reliable evidence shows that adopting the Special Masters' recommendation will eliminate that purported constitutional harm." The State further "object[ed] because of the logistical challenges of implementing the full recommendation," stating:

> It is not practical or fair to require third parties such as [child placing agencies], who operate much smaller businesses without the same level of IT capabilities, to completely change their software to match that of DFPS. DFPS depends on the highest level quality [child placing agencies] and does not wish to impose unnecessary disincentives on these often small, faith-based, and/or non-profit organizations.

The State also objected on the grounds that the comingling of records might compromise confidentiality and run afoul of, for example, federal laws protecting substance-abuse treatment records.

Responding to this new impasse, in January 2017, the district court entered an interim order addressing the Special Masters' recommendations and the State's objections, determining that "[f]urther studies and consultations between the Special Masters, the Court, and the State are necessary before a final order can be entered." Relevant here, the district court ordered the Special Masters "to work with DFPS to create and submit to the Court a plan for a comprehensive central databank for PMC children" and to "report the progress of the central databank creation to the Court within three months from the date of this Order."

In March 2017, following a status conference at which the parties and Special Master discussed the "availability of records regarding medical, dental, mental health, and educational issues," DFPS agreed "to provide complete responses to the Special Masters from its IT Department concerning the modernization of the IMPACT system, including but not limited to the capacity to include all the children's records in one system." In the following months the Special Masters' team corresponded and met with DFPS staff to discuss record keeping and to test the existing systems by examining a random sample of PMC children's records. Through these tests, the Special Masters found that health data and casefile records "did not align nearly half the time." DFPS's healthcare vendor, Superior Healthcare, maintained children's health records in a database "not compatible with, or linked to" the DFPS's casefile system. Neither DFPS nor its vendor's systems were capable of uploading and storing documents such as birth certificates medical, dental, and psychological evaluations. Instead, paper files were supposedly retained in the child's placement, private placement agencies, the caseworker's office, schools, or medical providers' places of business. But when the Special Masters visited a random sample of Foster Group Homes, they found that for many children records that should have been maintained on site were not available for inspection.

The Special Masters presented findings and proposed solutions in a December 2017 final report to the court. This report corroborates the district court's observations:

> DFPS maintains PMC children's records among numerous electronic and paper files, stored in different locations and maintained by distinct custodians. As the Court determined, the trial record, including exhibits, revealed evidence of children's records missing information, containing incomplete information and reflecting information that was

> inconsistent with information in other files. The Special Masters' examination of these case records among the trial exhibits, and other children's records as described below, confirmed that PMC children's records are currently stored in different locations with different custodians.

Based upon their examination, the Special Masters proposed that "[w]ithin four months of the Court's Final Order, DFPS . . . submit to the Court a plan for an integrated computer system" including complete medical, dental, educational, placement, court, mental-health and casefile records, documentation of visits with service providers, with test results, treatment plans, "and any other information necessary for the safety of the children." They recommended that the system be in place within a year of the district court's final order.

Objecting to the Special Master's latest proposal, the State argued to the district court that "there is no reliable evidence that DFPS's existing systems for maintaining and accessing PMC children's case records pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions." Judge Jack disagreed. Quoting directly from her 2015 liability opinion, describing the Special Masters' findings, and drawing upon examples of several named plaintiffs, she overruled the objection:

> Due to DFPS's burdensome administrative demands, such as filling out paperwork, [] caseworkers are only able to spend 26% of their time with children. . . . In its December 2015 Order, the Court noted it took eleven uninterrupted workweeks to read the twenty foster children's case files that were in evidence[,] in excess of 350,000 pages. Considering the dangerously high turnover rate, this task must be duplicated numerous times for each child, making it impossible for caseworkers to have enough time to focus on the children.

No. 18-40057

The district court's January 2018 Final Order adopts the Special Masters' proposed integrated computer system provisions, demanding a plan from the State within four months, to be realized within one year.

Today, the majority vacates these provisions, stating only that there is no constitutional right to an integrated computer system—of course, just as there is no freestanding constitutionally secured right to be bused to school. The question is not whether the Constitution guarantees a freestanding right to an integrated computer system. Rather, it is whether the integrated computer system provision is a necessary part of a remedy "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order,"[23] here, Texas's constitutional wrongs. As with all exercises of equitable power, "the nature of the violation determines the scope of the remedy."[24] For compliance with the command that an injunction be narrowly tailored, we look to the fit of ends and means and to the factual matrix tying those ends and means. This matrix of fact is before us, unchallenged, and in *Stukenberg I* we upheld the district court's integrated computer provisions as a remedial response to the found constitutional wrongs.

The district court did not abuse its discretion by insisting that the integrated computer system provisions directly address a cardinal element of the constitutional wrong.[25] As we found in *Stukenberg I*, DFPS's "records and case files are outdated and woefully incomplete"[26] with information in such an

---

[23] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013).

[24] *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971).

[25] *ODonnell v. Harris Cty.*, 892 F.3d 147, 155 (5th Cir. 2018) ("This court reviews a district court's grant of a preliminary injunction . . . for abuse of discretion. Findings of fact are reviewed only for clear error; legal conclusions are subject to de novo review." (internal citations and quotation marks omitted)).

[26] *Stukenberg I*, 907 F.3d at 260.

24

"abysmal state"[27] that to find a record requires a "needle-in-a-haystack search."[28] To address this problem—and its role in DFPS's constitutional violations—"[a]n improved record-keeping practice w[ould] reduce caseworkers' overall workloads. It would also centralize and make accessible data critical to making safe placement decisions. . . . [A]ccess to comprehensive medical information, mental health records, and placement history for individual children would assist [the agency] in making an informed assessment about abuse allegations."[29] We upheld provisions that will require DFPS to identify child-on-child sexual abuse and to record confirmed allegations of abuse and sexual aggression in a child's casefile.[30] An integrated digitized record system, together with these abuse-recording requirements, would serve to ensure that information critical to each PMC child's welfare is available and accessible to that child's caseworker, a precondition to the child's safety and care.

Caseworker access to a PMC child's comprehensive record was made all the more important by the majority's vacatur of the caseload cap provisions. The district court had originally included the integrated computer provisions in a final order that also required that a PMC child's caseworker handle no more than 14 to 17 children's cases at a time. The district court determined this range was necessary based on the Child Welfare League of America's standard for minimum acceptable care,[31] as well as DFPS's own Work Measurement Study.[32] The majority vacated the caseload cap—a key element

---

[27] *Id.* at 255 n.24.

[28] *Id.*

[29] *Id.* at 282.

[30] *See, e.g., id.* at 278 (upholding provisions requiring DFPS to create a record of confirmed allegations of sexual abuse involving a child as victim or aggressor).

[31] *See id.* at 300 (Higginbotham, J., concurring in part and dissenting in part) (discussing the district court's reliance on CWLA standards).

[32] *See id.* at 300–01.

of the injunction—leaving DFPS instead to develop "internal standards" to guide caseload distribution. The allowance was made in a situation in which caseworkers are sometimes assigned 40 to 60 cases at a time,[33] and caseworker positions turn over at 25 percent during the first year and 43 percent by the end of the second.[34] Given how stretched caseworkers are in the absence of caseload caps, and the centrality of their attention and care in a child's care, the district court's insistence on integrated digital records was even more important. Integrated digitized records would enable caseworkers to concentrate on casework, that is, on children, as opposed to the administrative tasks currently occupying nearly three quarters of their time.

Informational deficiencies play a large role in DFPS's inability to protect PMC children from abuse and neglect. The district court has so found on a full record. It follows that an integrated computer system is no mere "best practice." It is an appropriate and necessary part of an injunction narrowly tailored to address caseworker workloads and deficient monitoring. The district court committed no abuse of discretion in adopting these provisions. The majority only announces that it finds the order not narrowly tailored. It refers to no less burdensome alternative—the State presented none. Against the facts upon which we sustained a holding of deliberate indifference, that conclusion is deeply flawed.

## III.

The State's principal objections are not to the provisions' remedial role but to claimed costs, for which it offers no evidence. It asserts that an integrated computer system would entail a "Major Information Resource Project," requiring legislative approval before the commitment of appropriated

---

[33] *Id.* at 257 (majority opinion).
[34] *Id.*

funds. Additionally, the State tells us, a new system would create a "logistical nightmare," requiring the burdens of "vendor solicitation, contract drafting, and contract approval," followed by design and software development, "data migration and testing . . . to ensure functionality." The State's assertions of infeasibility run against the implicit judgment of Special Master Kevin Ryan— not only the former commissioner of New Jersey's child welfare agency, but also a monitor in the state of Michigan's reform of its foster-care system and advisor to Oklahoma and Mississippi on reforms of their foster-care systems. The State's pronouncements that DFPS's informational shortcomings are "inevitable" in "any state foster care system," and that no other state has such a system—are unsupported by the record. Plaintiffs point out that "at least Washington, D.C., Tennessee, and New Jersey already use such integrated digital record-keeping systems," and have done so for years. The reality is that the burdens the State puts forward are no more than part and parcel of its neglect—of its deliberate indifference to the children in its charge; indifference that created a nightmare for essential governance of its foster-care system. Its engagement with the unchallenged reality is to challenge the district court's remedy as requiring "best practices." These denials of constitutional right come with their own answers. Best practices are not the handmaiden of deliberate indifference.

There is no support for the majority's position that an integrated digitized records system would be prohibitively expensive. All we have to rely upon are the conclusory statements of counsel. Counsel told the district court that costs of the reform could approach $10 million, a figure that has increased over tenfold on appeal to "hundreds of millions of dollars" in counsel's Reply Brief to this court. There is no record basis for any of these figures. These protestations also omit important context, for example, that the agency operates with over twelve thousand employees and a combined budget of $3.1

billion over two years,[35] with roughly half of the State's child-welfare agency spending covered by federal funds, over $730 million in fiscal year 2016.[36] That is, extending such figures over the past decade, a period during which the State was deliberately indifferent to the rights of PMC children, its child-welfare agency has spent billions of dollars from the federal treasury. The appropriate time to raise bona fide concerns about cost would have been during the Special Masters' year of analysis and consultation for a record-keeping reform plan. But the State did not detail costs then. Rather, it was reluctant to cooperate further. As the district court stated in its Final Order,

> Defendants have known about the Court's concerns with the IMPACT system since the Court identified them over two years ago in its December 2015 Order. Despite this, Defendants have apparently done little to prepare for eventual reforms. The Special Master asked Defendants to assess and report the time needed to improve IMPACT so that it could store all of a child's medical, dental, mental health, educational, and court records. Defendants' response to each of these inquiries was "[n]ot applicable[.] DFPS is not making such changes to the IMPACT system." Similarly, Defendants responded to the Special Master's request for a draft plan to achieve the Court's recordkeeping goals by stating "[n]ot applicable. Texas is not developing such a plan." Defendants now object, fifteen days after the Plan was filed, that the Plan's timelines for these goals are "impossible." Defendants offer no explanation for why they were unable to present the Special Master with the estimate they now present the Court in their Objections, that it could take $10 million and several years to reform IMPACT.

---

[35] Edgar Walters, *Pay Caseworkers and Fosters More, Chief Says*, THE TEXAS TRIBUNE (July 6, 2016).

[36] *See, e.g.*, CHILD TRENDS, *Child Welfare Agency Spending in Texas* at 1 (2018) *available at* https://www.childtrends.org/wp-content/uploads/2018/12/Texas_SFY2016-CWFS_12.13.2018.pdf (reporting that 47 percent of child-welfare agency spending in Texas is covered by federal funds).

No. 18-40057

Even now, Defendants offer no evidence in support of this estimate.

Under these provisions the State retained the initiative to propose a plan to unify digital records, but wholly failed to do so.

The integrated computer system provisions have an appropriate and obvious place in the district court's injunction, narrowly tailored to remedy DFPS's workload and oversight violations. That reforms deferred for decades have become costly to undertake is not surprising. DFPS's neglect and indifference have allowed its problems to snowball. After years of litigation, including a two-week bench trial and a year-long study by its appointed Special Masters, the district court reached the judgment that DFPS requires integrated digitized records for PMC children in order to remedy its constitutional violations. The State's unsupported assertions of impracticability do not establish an abuse of the district court's discretion, nor does its naked assertion that the provisions were not necessary to remedy the wrong, here little more than a recast contention that there was no wrong—no failure of a constitutional dimension.

IV.

In sum, the majority's vacatur of the integrated computer system provisions strikes at the heart of a remedial order responding to the State's deliberate indifference to the welfare of 12,000 PMC children and the breach of its constitutional command to tend to their care. The State has offered no new circumstances or insights justifying a change in this court's order—nothing but a nigh casual, off-the-cuff statement by able counsel that such systems are expensive and not deployed by other states, hence an imposition of "best practices." The State's assertion regarding use in other states was immediately contradicted at oral argument by opposing counsel, without challenge.

No. 18-40057

To counter the sting of deliberate indifference the State speaks of hundreds of millions of dollars being turned towards the Texas foster care system, yet its answer is only that a new system is too expensive, that with a few patches it can make do with the present system—a stunning assertion that ignores the obvious question: why then only now? We must keep ever in mind the long-reaching consequences of this dysfunctional system. In fiscal year 2017, six years after this suit was filed, 38 TMC and PMC children died in DFPS custody; 554 children spent two or more consecutive nights in hotels or government office buildings; meanwhile, 352 caseworkers voluntarily ended their employment with DFPS. Aside from the suffering of children within state custody, as I described in *Stukenberg I*, 1,300 to 1,400 PMC children age out of DFPS care every year.[37] These aged-out children "lack independent living skills" and are unprepared for adult life; according to a witness who runs a non-profit to help aged-out children, "[t]hey do not know how to answer a phone, take or leave a message, cook a meal for themselves, or load a dishwasher. They do not know how to fill out a job application, let alone drive a car to get to work."[38] Former foster youths suffer from post-traumatic stress disorder at nearly five times the rate of the general population and nearly twice the rate of United States combat veterans.[39] Around 27 percent of children aging out of care end up in the criminal-justice system, and a third become homeless.[40] Once homeless, one out of three will become involved in prostitution; according to one amicus, "the Texas child welfare system is effectively supplying the sex-trafficking industry with current and former

---

[37] *Stukenberg I*, 907 F.3d at 292 (Higginbotham, J., concurring in part and dissenting in part).

[38] *M.D.*, 152 F. Supp. 3d at 790.

[39] *Id.*

[40] *Stukenberg I*, 907 F.3d at 292 (Higginbotham, J., concurring in part and dissenting in part).

No. 18-40057

foster youth."[41] Among female former-PMC children, 49 percent become pregnant within a year of aging out; 70 percent of their children then enter the same foster-care system.[42] The social cost of this unreformed system is enormous. Looking past the loss of the forces of basic morality and fairness, the dollar cost to the State entailed by this feedback into government custody by its released charges must far exceed the cost of a sound system.

V.

The State's view of narrow tailoring is transparent. Implicit in a failure to narrowly tailor a remedy is an effective alternative. The facts in the record and the State's conduct before the district court make plain that its alternative is to leave DFPS's flawed record-keeping system in place. My colleagues mistakenly only reward the State's resistance to the orders of the United States District Court.

Finally, the State's approach to these efforts to protect the constitutional rights of our children is now shot through with two rending realities. First, the majority's talismanic use of "best practices" betrays an anemic view of the State's constitutional duty to care for the children it takes into its charge. This limpid cast places that duty nigh on a plane of state-owed duties to its convicts, and is in sharp tension with our finding of deliberate indifference.[43] Indeed, the majority has excised detailed remedial provisions addressing DFPS's abject failure to prepare children aging out of PMC custody for safe and productive adult life, a denial of programs the likes of which are routinely afforded to convicts before their reentrance to society. Again, the State's obligation runs

---

[41] *Id.* (quoting Brief of Disability Rights Texas as Amicus Curiae at 8).

[42] *Id.*

[43] *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners. . . . [H]aving stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

not to some abstract universe of "foster-care children," rather it runs to each of these children as an individual.[44] At its core, this obligation must be larger than food, shelter, and sojourns through a succession of public schools. When the State deploys persons termed "I See You" workers to locate its charges it exposes its failure to abide its constitutionally imposed duty. Second, that the State's fervor for potential life subsides when that potential is realized brings puzzlement that would defy the genius of Fyodor Dostoevsky's dissection of the human psyche—in simultaneous pursuit of ends in conflict, each with the other.

To these eyes, the State repairs to an unrecognizable view of our federalism—one that elides its core. Federal law is also the State's law, and the federal court here arrives because the State has refused to fulfill its constitutional duty, one owed to the 12,000 PMC children in its charge. Its reflexive resistance to the federal district court's remedial orders—both direct confrontation and a refusal to cooperate or otherwise participate in the crafting of a response—bespeaks a view of our federalism inverted to look past the unchallenged finding of this court of the State's deliberate indifference to the constitutional rights of PMC children, in part a call to account given that half its monies come from the federal treasury. One would think that the presentation ought to be one of cooperative federalism. The State's noble enterprise to take custody of these children is being hollowed by bureaucratic wrangling and ineptitude, a threatened stain on Texas—and a retreat by this

---

[44] *Stukenberg I*, 907 F.3d at 302 (Higginbotham, J., concurring in part and dissenting in part) ("Treating a child as an individual—protecting his or her identity as an individual—has long been the concern of human rights conventions, a concern that also lies at the core of the liberty guaranteed in the Fourteenth Amendment."). This international concern is captured in the poignant words "[t]he child . . . shall have the right from birth to a name." United Nations Convention on the Rights of the Child, arts. 7–8, 19, Nov. 20, 1989, 28 I.L.M. 1448.

court, once a refuge for such innocents, ready to enforce federal law when a state fails its obligation to do so, as it must.

Five years after the filing of this lawsuit, but soon after the district court's finding of deliberate indifference, the Governor appointed a new DFPS commissioner to "overhaul[] a broken system" and address a "status quo" that was "unacceptable."[45] A commendable effort, but it now comes alone onto a stage with lights dimmed by this court's retreat, leaving as a lonely heuristic this court's finding that for more than a decade the State has been deliberately indifferent to the rights of children in its custody. If the judiciary upholds this walk away, the audience of the people remains—which for the sake of the children hopefully will be a sufficient incentive to sustain and expand the late arriving effort to more fully discharge the State's duty, in this real world a hope unlikely to be realized, as pointed out in my earlier dissent:

> At least as early as 1996, DFPS was unmoved by the first of the "twenty years of studies conducted or commissioned by the State." The administration of Governor Perry returned to DFPS's problems in 2010, pointing out that the agency had still not fixed the problems identified almost fifteen years earlier. Most recently, the district court noticed the current commissioner's exhortations to reform at DFPS, and his acknowledgments that, as yet, the agency was overwhelmed: "our workers are outnumbered by the opponent—child abuse and neglect." In its Liability Order, the district court observed that the State had appointed its "seventh commissioner since 2004, each of whom was surely ushered in with promises that this time it will be different." More than "[t]wo years and

---

[45] Edgar Walters, *Abbott Names New Leaders at Embattled Child Welfare Agency*, THE TEXAS TRIBUNE (April 11, 2016). This Commissioner recently announced his resignation of the post after three years heading DFPS. Edgar Walters, *Texas Child Welfare Chief Hank Whitman Announces Retirement*, THE TEXAS TRIBUNE (May 28, 2019). Governor Abbott was elected in 2014, three years after this suit was filed, following service as Texas's attorney general and as a Justice of the Supreme Court of Texas.

No. 18-40057

one legislative session" after the liability determination, the constitutional deprivations remained unaddressed. The "foster care system of Texas [was still] broken[.]"[46]

It is to this history that my colleagues defer—in the name of federalism.

---

[46] *Stukenberg I*, 907 F.3d at 298 (Higginbotham, J., concurring in part and dissenting in part).

34

No. 18-40057

## APPENDIX:

| Excised Injunctive Provision | Majority's Rationale |
|---|---|
| *Caseload-Specific Provisions* | |
| Caseload-cap mandating a range of 14–17 children per caseworker. *Stukenberg I*, 907 F.3d at 273–74. | The measure would exacerbate DFPS's staffing crisis in the short term, and, more broadly, is "too blunt a remedy . . . beyond what [is] minimally required" to remedy the constitutional violation." *Id.* at 274. Instead, "DFPS absolutely should determine how many cases, on average, caseworkers are able to safely carry. Based on its determination, DFPS should establish generally applicable, internal caseload standards. . . . as a rough guide for supervisors who are handling caseload distribution, and they should inform DFPS's hiring goals." *Id.* at 274. |
| Recruitment of new caseworkers. *Id.* | The measure is "improper . . . either exceed[ing] what is required to achieve constitutional compliance or . . . not directly address[ing] the problems giving rise to the caseload management violation." *Id.* Also, it potentially "would unnecessarily add to the volume of work for which caseworkers are responsible, and would increase the time spent managing paperwork and compliance and administrative burdens." *Id.* |
| Comprehensive training and competency examinations for new caseworkers. *Id.* at 275. | Same as previous. *Id.* at 274. |
| Monthly face-to-face meetings between caseworkers and each child under their care. *Id.* at 275. | Same as previous. *Id.* at 274. |
| Caseworker training on visitation policies. *Id.* at 275. | Same as previous. *Id.* at 274. |
| Quarterly reports on caseworker–child visits. *Id.* at 275. | Same as previous. *Id.* at 274. |
| Adherence to agency contact guidelines, including caseworker assessments of each child's safety and medical, mental-health, and educational needs. *Id.* at 275. | Same as previous. *Id.* at 274. |
| Requirement that supervisors carry no caseload of their own and oversee no more than seven caseworkers. *Id.* at 275. | Same as previous. *Id.* at 274. |

No. 18-40057

| | |
|---|---|
| Elimination of the use of "I See You" workers. *Id.* at 275. | Same as previous. *Id.* at 274. |
| ***Monitoring and Oversight Provisions*** | |
| Establishment of a statewide 24-hour hotline accessible to PMC children to report and record calls concerning abuse and neglect. *Id.* at 279. | The measure "do[es] not address the discrete issues underlying the violation: the manner in which RCCL documents and investigates allegations of abuse. To the extent that the court is worried about underreporting, this can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues. The problem with RCCL follow-up is sufficiently addressed by other valid provisions." *Id.* |
| Requirement that all foster homes maintain a landline phone accessible to children. *Id.* | Same as previous. *Id.* |
| Requirement that DFPS ensure PMC children are able to access and use the 24-hour hotline. *Id.* at 280 | The measure would "unnecessarily increase the time spent managing administrative burdens." *Id.* at 279. |
| Requirement that DFPS record all calls to the 24-hour abuse and neglect hotline, and store the recordings for two years. *Id.* at 280. | Same as previous. *Id.* at 279. |
| Requirement that foster caregivers report all allegations of child on child sexual abuse via the 24-hour hotline. *Id.* at 280. | Same as previous. *Id.* at 279. |
| Requirement that DFPS track referrals of child-on-child sexual abuse. *Id.* at 280. | Same as previous. *Id.* at 279. |
| Quarterly reports on all child-on-child abuse referrals made to the hotline that have been assigned for investigation. *Id.* at 280. | Same as previous. *Id.* at 279. |
| Requirement that investigations of abuse and neglect in licensed placements are conducted by staff with caseloads exclusively focused on maltreatment investigations. *Id.* at 280. | Same as previous. *Id.* at 279. |
| Caseload cap of 14 cases for RCCL workers investigating abuse and placement licensing requirements. *Id.* at 280–81. | The measure is "misguided for substantially the same reasons that caseload caps are ill-advised in the primary caseworker context. Again, however, it would be reasonable for the court to require a comprehensive workload study and the establishment of internal guidelines for caseload ranges based on what DFPS determines RCCL investigators can safely manage." *Id.* at 279. |

| | |
|---|---|
| Disclosure of redacted licensing inspection reports, including the outcome of the inspection, violations, and the agency's corrective actions addressing the violations. *Id*. at 281. | The measure is "not only unnecessary, but . . . also implicates confidentiality concerns." *Id.* at 279. |
| ***"Crossover" Provisions*** | |
| Requirement that each PMC child's case file include a current photograph of the child. *Id*. at 283. | The measure is "improper" because it is "designed to remedy what the district court believed to be additional, related problems with the foster care system" and is "not calculated to remedy an identified constitutional violation." *Id*. Additionally, it potentially would "only increase caseworkers' administrative burdens." *Id.* |
| Requirement that DFPS obtain a photo of each child within 48 hours of their entering PMC custody. *Id*. | Same as previous. *Id.* |
| Requirement that DFPS ensure children under three have photos updated at least semi-annually. *Id*. | Same as previous. *Id.* |
| Requirement that DFPS ensure caseworkers have proper training in photographing and uploading pictures of children in their care to the casefile system. *Id*. | Same as previous. *Id.* |
| Provision of a birth certificate and social security card to each PMC child at the age of sixteen. *Id*. | Same as previous. *Id.* |
| Provision of educational and medical records to each PMC child prior to their aging out of care. *Id*. at 283–84 | Same as previous. *Id.* at 283. |
| Identification by DFPS of PMC children aged 14 or older who have not received independent living preparation services. *Id*. at 284. | Same as previous. *Id.* at 283. |
| Requirement that 14- and 15-year-old PMC children receive the agency's Preparation for Adult Living services and that 14-year-olds receive a life-skills assessment and transition planning services, with accommodations for disabled PMC children. *Id*. at 284. | Same as previous. *Id.* at 283. |
| Development of a plan for expungement of each child's eligible criminal or juvenile offense records before the aging out of care. *Id*. at 284. | Same as previous. *Id.* at 283. |

| | |
|---|---|
| Development of a plan for each child to access benefits for which they are eligible upon aging out. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Provision of driver's education to eligible PMC children. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Creation of email accounts for 14-year-old PMC children for receipt of encrypted personal documents and records. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Appointment of an attorney *ad litem* for PMC children unrepresented in pending cases. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Development of a plan for reimbursement of PMC children's attorneys *ad litem* in those courts that do not provide attorneys *ad litem*. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Training for caseworkers on child health. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Requirement that DFPS make every effort to obtain a child's medical records within 24 hours of the child entering DFPS custody. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Provision of a "medical home" to provide comprehensive and continuous medical care to each PMC child. *Id*. at 285. | Same as previous. *Id.* at 283. |
| Annual developmental screenings for each PMC child. *Id.* at 286. | Same as previous. *Id.* at 283. |
| Casefile system alerts notifying caseworkers of a child's scheduled medical screenings, immunizations, and appointments. *Id.* at 286. | Same as previous. *Id.* at 283. |
| Regular caseworker verification of each child's health status. *Id.* at 286. | Same as previous. *Id.* at 283. |
| Prohibitions on placing unrelated children more than three years apart in age or in different service levels in the same room. *Id.* at 286–87. | Same as previous. *Id.* at 283. |
| Prohibition on housing children in DFPS offices. *Id.* at 287 | Same as previous. *Id.* at 283. |
| Placement of PMC children younger than two in family-like settings within six months of the order, children younger than six within 12 | Same as previous. *Id.* at 283. |

38

No. 18-40057

| months, and children under thirteen within 24 months. *Id.* at 287. | |
|---|---|

39